IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Allyson D. Martini-Roth, | ) | C/A No.: 1:14-4683-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On November 9, 2009, Plaintiff filed applications for Disability Insurance Benefits
("DIB") and SSI in which she alleged her disability began on August 15, 2008. Tr. at
112–15, 119–22. Her applications were denied initially and upon reconsideration. Tr. at
53–55, 56–58, 60–63, 67–68. On December 14, 2011, Plaintiff had a hearing before

Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 25–47 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 9, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 6–24. Subsequently, the Appeals Council denied Plaintiff's request for review. Tr. at 1–3. On June 11, 2012, Plaintiff brought an action in this court seeking judicial review of the Commissioner's decision. Tr. at 860. By order dated August 23, 2013, the court remanded Plaintiff's case to the Commissioner to address Plaintiff's eligibility for DIB. Tr. at 859–81. Plaintiff subsequently withdrew her claim for DIB through a pre-hearing motion.[1] Tr. at 1118. A second hearing was held before ALJ Christ on July 24, 2014. Tr. at 784–802. The ALJ issued an unfavorable decision on October 8, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 766–83. Plaintiff declined to file written exceptions with the Appeals Council, and the ALJ's decision became the final decision of the Commissioner. Tr. at 766–67. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 11, 2014. [ECF No. 1].

---

[1] A report of contact in the record indicates the Charleston district office of the Social Security Administration ("SSA") was contacted to determine Plaintiff's date last insured ("DLI") for DIB coverage. Tr. at 1063. The note indicates Plaintiff was only insured for DIB for the period from April 1, 1987, through June 30, 2001. Tr. at 1064. Because Plaintiff initially alleged an onset date of disability of August 15, 2008, she was not eligible for DIB coverage. *See* 20 C.F.R. § 404.131(b) ("To become entitled to disability insurance benefits, you must have disability insured status in the first full month that you are disabled as described in § 404.1501(a) . . .").

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 47 years old at the time of the most recent hearing. Tr. at 787. She completed high school and one year of college. Tr. at 788. Her past relevant work ("PRW") was as a caterer, a sales director, a secretary, and a kitchen supervisor. Tr. at 799–800. She alleges she has been unable to work since November 9, 2009.[2] Tr. at 809.

2.     Medical History

Plaintiff's medical history includes multiple hospitalizations prior to the date she alleges she became unable to work. Plaintiff was hospitalized at the Medical University of South Carolina's ("MUSC's") Institute of Psychiatry from March 23 to March 30, 1998, for suicidal ideations. Tr. at 289–90. Her discharge diagnoses included alcohol dependence, cannabis dependence, alcohol withdrawal-related seizures, substance-induced mood disorder, anorexia nervosa, borderline personality disorder, hypothyroidism, and moderately-severe psychosocial stressors. Tr. at 290. She was again hospitalized from July 20 to 31, 1998, for alcohol dependence. Tr. at 291–92, 293–94. Plaintiff was next hospitalized at MUSC's Institute of Psychiatry from August 16 to September 3, 1998, for suicidal ideations with a plan to kill herself with a knife. Tr. at 295. Her discharge diagnoses included anorexia nervosa, substance-induced mood disorders versus bipolar affective disorder, acute alcohol intoxication, alcohol withdrawal, alcohol dependence, cannabis dependence/abuse, borderline personality

---

[2] Because Plaintiff withdrew her claim for DIB, her claim became one for SSI only, and her earliest possible established onset date was November 9, 2009, the date the SSI claim was filed. *See* POMS DI 25501.370(A)(1).

disorder, hypothyroidism, and alcohol-related seizures. Tr. at 296. Plaintiff was hospitalized February 7–9, 1999, at MUSC's Institute of Psychiatry, after leaving six suicide notes and informing her sister that she was suicidal. Tr. at 298. Her discharge diagnoses included type I bipolar affective disorder, post-traumatic stress disorder ("PTSD"), acute alcohol intoxication, alcohol withdrawal, alcohol dependence with detoxification and rehabilitative therapy, nicotine dependence, borderline personality disorder with histrionic traits, history of seizure disorder, history of hypothyroidism, and history of head injuries with loss of consciousness. Tr. at 299.

Plaintiff was again admitted to MUSC's Institute of Psychiatry for suicidal ideations from January 14 to 16, 2004. Tr. at 300. Her discharge diagnoses included bipolar disorder, not otherwise specified ("NOS") and gastroesophageal reflux disease ("GERD"). *Id.*

Plaintiff was hospitalized at Bon Secours St. Francis Hospital from November 7 to 13, 2008, with agitation and suicidal ideation. Tr. at 347. Attending physician Samuel H. Rosen, M.D., indicated Plaintiff had a questionable history of bipolar disorder, but that she had no clear history of hypomania and that it was difficult to diagnose anything other than substance-induced mood disorder because she had so little history of longstanding sobriety. *Id.* Plaintiff's discharge diagnoses included substance abuse mood disorder, alcohol abuse and dependence, seizure disorder, and anxiety disorder, NOS. Tr. at 348.

Plaintiff followed up at Charleston Mental Health on November 18, 2008. Tr. at 483. She endorsed some difficulty sleeping since being discharged from the hospital. *Id.* Felecia R. Boyd, APRN ("Ms. Boyd"), described Plaintiff's insight and judgment as

4

poor. *Id.* Plaintiff endorsed recent suicidal ideations, but denied suicidal ideations during her visit. *Id.* Ms. Boyd indicated diagnoses of bipolar affective disorder, PTSD, alcohol dependence, and history of seizure disorder. Tr. at 484. She assessed Plaintiff to have a global assessment of functioning ("GAF")[3] score of 40. *Id.*

Plaintiff followed up with Ms. Boyd on January 12, 2009, and reported a recent seizure that lasted for 15 minutes, was accompanied by vomiting and incontinence, and was followed by difficulty walking and forming words. Tr. at 485. She denied that the seizure was related to her alcohol use. *Id.* Ms. Boyd assessed Plaintiff to have a GAF score of 55. Tr. at 486. Ms. Boyd instructed Plaintiff to follow up with her primary care physician and to obtain lab work. *Id.*

On February 13, 2009, Ms. Boyd observed Plaintiff to smell strongly of alcohol. Tr. at 487. Ms. Boyd noted that Plaintiff drove to her appointment and appeared to be intoxicated. *Id.* She also indicated Plaintiff had lost 10 pounds since her last visit and weighed only 95 pounds. *Id.* Ms. Boyd encouraged Plaintiff to go to the emergency department, but Plaintiff attempted to leave. *Id.* Ms. Boyd contacted the mobile crisis unit and confiscated Plaintiff's keys. *Id.* She assessed a GAF score of 50. Tr. at 488.

Plaintiff was transported to MUSC's emergency department on March 6, 2009, after driving to an appointment at Charleston Mental Health while intoxicated. Tr. at 460.

---

[3] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("*DSM-IV-TR*"). The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

Plaintiff reported drinking a fifth of vodka each day since January. *Id.* She indicated her bipolar disorder was controlled as long as she took Topamax and Prozac. *Id.* On March 10, 2009, Plaintiff was released to follow up with Charleston Center and attend Alcoholics Anonymous ("AA") meetings. Tr. at 462.

Plaintiff presented to Brodie Edens McKoy, M.D. ("Dr. McKoy"), on July 22, 2009, complaining of occasional, but worsening, left shoulder pain. Tr. at 414. She indicated she fell from a bicycle three weeks earlier and injured her left shoulder. *Id.* She endorsed additional symptoms that included decreased mobility, difficulty falling asleep, pain and awakening during the night, numbness, swelling, tingling in the arms, tenderness, and weakness. *Id.* Dr. McKoy observed the following in Plaintiff's left shoulder: asymmetrical posture, tenderness in her acromioclavicular ("AC") joint, decreased internal rotation, and decreased flexion. Tr. at 415–16. He advised Plaintiff to take muscle relaxants and Mobic and to follow up in three weeks. Tr. at 416. He indicated that he would recommend magnetic resonance imaging ("MRI") if Plaintiff's symptoms did not improve before her next visit. *Id.*

Plaintiff presented to Broxann B. Spencer, M.D. ("Dr. Spencer"), at Charleston Mental Health on July 28, 2009. Tr. at 489–90. She indicated she had experienced several recent seizures and had been off her medications for bipolar disorder for at least a month. Tr. at 489. She complained of labile mood, poor sleep, variable appetite, irritability, and suicidal ideations with a plan for self-harm, but contracted for safety. *Id.* Dr. Spencer assessed a GAF score of 65. Tr. at 489–90.

Plaintiff followed up with Dr. McKoy on August 12, 2009. Tr. at 411. She indicated that medications and rest had not decreased her pain. *Id.* Dr. McCoy referred her for an MRI of her left shoulder. Tr. at 412–13.

Plaintiff followed up with Ms. Boyd on August 14, 2009. Tr. at 491–92. She indicated she was depressed because she was separated from her husband, but indicated she had remained sober for over a month. Tr. at 491. She endorsed some difficulty sleeping and complained of feeling tired all the time. *Id.* Ms. Boyd assessed a GAF score of 55. Tr. at 492.

On August 24, 2009, an MRI of Plaintiff's left shoulder revealed mild supraspinatus tendinopathy and mild widening of the left AC joint with some fluid signal intensity within the joint space and mild distention of the joint capsule. Tr. at 389.

Plaintiff followed up with Dr. McKoy on August 31, 2009, to review her MRI results. Tr. at 409. Dr. McKoy diagnosed a closed dislocation of Plaintiff's AC joint and a rotator cuff sprain. Tr. at 410.

On September 22, 2009, Plaintiff reported to Ms. Boyd that her moods were up and down. Tr. at 493. Ms. Boyd indicated Plaintiff was involved in group therapy at Charleston Center and Charleston Mental Health and attended at least two AA meetings per week. *Id.* Plaintiff complained that she was sleeping too much and lacked energy. *Id.* She indicated she had not consumed alcohol in two months. *Id.* Ms. Boyd assessed a GAF score of 60. Tr. at 494.

On September 28, 2009, Plaintiff complained to Dr. McKoy that her left shoulder pain was a nine on a 10-point scale of severity. Tr. at 407. She stated her pain was

aggravated by lifting and movement and relieved by prescription pain medications. *Id.* Dr. McKoy administered an injection to Plaintiff's AC joint. Tr. at 408.

Plaintiff followed up with Dr. McKoy on October 14, 2009. Tr. at 404–06. She complained of occasional left shoulder pain, accompanied by stiffness, weakness, and swelling. *Id.* Dr. McCoy diagnosed a rotator cuff sprain and an AC sprain. *Id.*

On October 20, 2009, Ms. Boyd noted that Plaintiff continued to participate in group therapy sessions at both Charleston Mental Health and Charleston Center. Tr. at 495. Plaintiff indicated her 12-year-old son physically and verbally abused her. *Id.* She endorsed some suicidal ideations, but indicated she would not follow through because of her spiritual beliefs. *Id.* Ms. Boyd assessed a GAF score of 55. Tr. at 496.

A discharge summary from Charleston Center dated November 6, 2009, indicates Plaintiff successfully completed a treatment program for substance abuse. Tr. at 400. Plaintiff was admitted to the program on September 9, 2009, and engaged in group counseling from September 14, 2009, to November 2, 2009. *Id.* Her diagnoses were alcohol dependence with sustained partial remission, PTSD, and bipolar disorder, NOS. *Id.*

Plaintiff presented to the emergency department at MUSC Health on November 18, 2009. Tr. at 427. She was acutely intoxicated and had expressed suicidal ideations to her mental health caseworker. *Id.* Plaintiff indicated she had been drinking a lot in the prior two days after having been sober for approximately five months. *Id.* She denied suicidal ideations and contracted for safety while in the emergency department. Tr. at

427–28. She was admitted to MUSC Medical Center for alcohol detoxification November 18–25, 2009. Tr. at 457.

On December 10, 2009, a computed tomography ("CT") scan of Plaintiff's brain showed no acute intracranial pathology. Tr. at 453.

Plaintiff presented to Stephen K. Baker, M.D. ("Dr. Baker") at Charleston Mental Health on December 15, 2009. Tr. at 497–98. Dr. Baker indicated Plaintiff had stopped taking Gabapentin and was taking her ex-husband's[4] Valium. Tr. at 497. He observed Plaintiff to be medication-seeking and hostile. *Id.* He instructed the case manager to notify Plaintiff's ex-husband that she was volatile and that he needed to lock up his Valium. Tr. at 498. Dr. Baker noted Plaintiff was angry and may act out in a self-destructive manner, but he assessed Plaintiff to have a GAF score of 55. *Id.* He indicated Plaintiff did not meet the criteria for involuntary commitment based on her psychiatric impairments, but indicated judicial papers had been taken out for chemical dependency, which was "clearly indicated." *Id.*

Plaintiff was hospitalized January 8–20, 2010, at MUSC's Institute of Psychiatry. Tr. at 471. She initially presented to East Cooper Medical Center ("ECMC") following a suicidal gesture while acutely intoxicated. *Id.* Plaintiff reported symptoms of depression and mania. *Id.* She indicated she had been sober for several months before relapsing three or four days prior to being admitted to ECMC. Tr. at 472. She stated she had decompensated in the setting of medication nonadherence and alcohol relapse. Tr. at 473.

---

[4] Plaintiff uses both "ex-husband" and "husband" to describe her significant other. Treatment records indicate Plaintiff separated from her third husband and moved in with her second husband. Tr. at 457, 570.

Plaintiff's discharge diagnoses included bipolar disorder, alcohol dependence, PTSD, obsessive compulsive disorder ("OCD"), history of panic attacks, borderline personality disorder, seizures, and hypertension. Tr. at 474.

Plaintiff followed up with Ms. Boyd on February 1, 2010. Tr. at 513–14. Ms. Boyd indicated Plaintiff was very guarded and indicated she had so many stressors that she was unwilling to discuss any of them with specificity. Tr. at 513. She observed Plaintiff to be very vague in answering questions. *Id.* Plaintiff indicated she was not taking some of her medications because she did not like the way they made her feel. *Id.* Ms. Boyd assessed a GAF score of 45. Tr. at 514.

On March 4, 2010, state agency consultant Hugh Wilson, M.D., completed a physical residual functional capacity ("RFC") assessment. Tr. at 518–25. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; frequently reach overhead with the left upper extremity; and must avoid all exposure to hazards. *Id.*

Plaintiff was admitted to Morris Village from February 18 to March 18, 2010. Tr. at 529. At the time of admission, L. Marche Carr, M.D. ("Dr. Carr"), assessed Plaintiff to have a GAF score of 30. Tr. at 530. Plaintiff's discharge diagnoses were alcohol dependence, bipolar disorder by patient history, seizure disorder, hypertension, and chronic substance abuse. *Id.* Dr. Carr advised Plaintiff to follow up with Charleston

Center and Charleston Mental Health, to attend AA meetings, to maintain abstinence, and to follow up with her primary care physician for high blood pressure. Tr. at 531.

Plaintiff presented to John V. Custer, M.D. ("Dr. Custer"), for a mental status examination on April 19, 2010. Tr. at 568–71. Dr. Custer indicated Plaintiff was calm and cooperative, but had a tendency to provide intentionally vague answers to some questions. Tr. at 568. Plaintiff admitted to Dr. Custer that she had resumed drinking after her discharge from MUSC on January 20, 2010, and had been arrested for driving under the influence ("DUI") on January 27. *Id.* Plaintiff reported more manic than depressive symptoms. Tr. at 569. She was alert and fully-oriented on the cognitive examination. Tr. at 570. She had no difficulty remembering past presidents, performing serial sevens or following a three-stage command. *Id.* She could immediately recall three of three items and could remember two of three items after a delay. *Id.* Plaintiff scored 29 of a possible 30 points on the Folstein Mini-Mental State Examination ("MMSE"). *Id.* Dr. Custer assessed alcohol dependence, in early remission; possible bipolar disorder, NOS; and borderline and/or histrionic personality traits. Tr. at 571. He indicated it was not entirely clear from the objective evidence whether Plaintiff met the diagnostic criteria for bipolar disorder. *Id.* He indicated "[w]ith abstinence from alcohol and a better compliance with her psychiatric treatment, it is likely that her functioning would significantly improve." *Id.* He recommended Plaintiff have a representative payee because of her history of substance abuse and poor money management. *Id.*

On April 27, 2010, Plaintiff presented to Elizabeth A. Canepa, M.D. ("Dr. Canepa"), at Charleston Mental Health. Tr. at 545–46. She indicated she had thoughts of

suicide, but denied current mood symptoms and indicated she was sleeping well with normal energy. Tr. at 545. Plaintiff endorsed daily thoughts of using alcohol, but reported she remained abstinent and was attending three AA meetings per week. *Id.* Dr. Canepa assessed Plaintiff as having a GAF score of 65. Tr. at 546.

On May 13, 2010, state agency consultant Olin Hamrick, Ph. D. ("Dr. Hamrick"), completed a psychiatric review technique form ("PRTF"). He considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders. Tr. at 553. Dr. Hamrick indicated Plaintiff's diagnoses included bipolar disorder and alcohol dependence in early remission. Tr. at 556, 561. He assessed Plaintiff as having mild restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 563. He found that Plaintiff had no extended episodes of decompensation. *Id.* Dr. Hamrick concluded as follows:

> The allegation of bipolar is consistent with the MER and considered to be credible. However, ADLs are intact; there is no evidence of any significant cognitive impairment, and ETOH Dep. appears to be the primary issues. CL is reported ETOH Dependence to be now in remission and active in AA. Overall, while abstinent from ETOH, there does not appear to be a mental condition that would impose any substantial limitation on work-related functions. NS

Tr. at 565.

Plaintiff followed up with Dr. Canepa on June 1, 2010. Tr. at 703–04. Dr. Canepa indicated Plaintiff's mood was elevated and that she had expressed some unusual thoughts to her case manager. Tr. at 703. She observed Plaintiff to be hypomanic and indicated she would monitor Plaintiff closely, increase her dosage of Geodon, and

discontinue her prescription for Prozac. Tr. at 704. She instructed Plaintiff to follow up in one week for therapy. *Id.*

On July 24, 2010, Plaintiff was transported to the emergency department at MUSC after she voiced a suicidal plan to jump off her balcony while intoxicated. Tr. at 595. Her mother-in-law reported that Plaintiff had been very irritable and sad and had jumped off the balcony five days earlier, but sustained minimal physical injury. Tr. at 597. Plaintiff admitted to drinking half a gallon of vodka before being transported to the emergency department. *Id.* She complained of poor sleep, irritable mood, flight of ideas, and risky behavior. *Id.* She indicated she had not taken her medications in at least a month. *Id.* She was discharged on July 27 with a GAF score of 50 and diagnoses of alcohol dependency, OCD, PTSD, borderline personality disorder, hypertension, and history of complicated ethanol withdrawal. Tr. at 636.

On August 30, 2010, clinician Alicia R. Murphy ("Ms. Murphy") provided a clinical assessment summary. Tr. at 639–40. She indicated Plaintiff's diagnoses included alcohol dependence, PTSD, and bipolar I disorder. Tr. at 639. She stated Plaintiff had problems related to her primary support group, her social environment, her occupational and economic situations, access to health care services, and interaction with the legal system. *Id.* Ms. Murphy recognized Plaintiff had a desire to remain sober and was very high-functioning. Tr. at 640.

Plaintiff followed up with Denise McTighe, M.D. ("Dr. McTighe"), at Charleston Mental Health on September 3, 2010. Tr. at 587–88. She reported to Dr. McTighe that she was feeling more anxious, but less depressed. Tr. at 587. She indicated she was

running for exercise and living with her future mother-in-law. *Id.* She requested a prescription for Klonopin. *Id.* Dr. McTighe prescribed one milligram of Klonopin, in addition to prescriptions for Geodon, Neurontin, and Prozac. Tr. at 588. She assessed a GAF score of 60. *Id.*

Plaintiff was admitted to Palmetto Behavioral Health from December 2, 2010, through December 14, 2010, for an alcohol relapse and suicide attempt. Tr. at 659. She overdosed on Xanax and alcohol. Tr. at 661. Plaintiff denied daily alcohol abuse, but stated she drank a couple of pints of vodka at a time during occasional drinking binges. Tr. at 667. She indicated her longest period of sobriety over the prior 15-year period lasted for five months. *Id.* She indicated she was noncompliant with her prescription for Depakote. *Id.* Plaintiff agreed to start Antabuse upon discharge. Tr. at 662. Her discharge diagnoses included alcohol dependence and borderline personality disorder. *Id.* Her GAF score was 60–65 at the time of discharge. *Id.*

On December 14, 2010, Debra Parks, LPC ("Ms. Parks"), indicated Plaintiff was participating well in a trauma support group. Tr. at 584. However, she also noted that Plaintiff's progress was limited by the fact that she continued to relapse. *Id.*

Plaintiff followed up with Xinchun Tang ("Dr. Tang") at Charleston Mental Health on December 20, 2010. Tr. at 673–74. She indicated she had not used alcohol since being discharged from Palmetto Behavioral Health. Tr. at 673. She reported good mood, sleep, appetite, and concentration and denied suicidal and homicidal ideations and auditory and visual illusions. *Id.* Plaintiff indicated her symptoms were responding well to Haldol, but she denied taking Antabuse or Campral. *Id.*

Plaintiff followed up with Dr. Tang on January 24, 2011. Tr. at 675–76. She reported continued sobriety and stated she was attending AA every other day. Tr. at 675. She indicated she was taking all of her medications, except Antabuse. *Id.* She complained of sexual side effects from Prozac. *Id.* She reported fair mood, appetite, and concentration and denied suicidal and homicidal ideations and auditory and visual hallucinations. *Id.* Plaintiff indicated she was exercising by running and lifting weights five to six days per week. *Id.* Dr. Tang discontinued Plaintiff's prescriptions for Antabuse and Prozac and prescribed Remeron. Tr. at 676–77. He assessed a GAF score of 58. Tr. at 676.

State agency consultant Lisa Clausen, Ph. D. ("Dr. Clausen"), reviewed the record and completed a PRTF on February 3, 2011. Tr. at 678. She considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.08 for personality disorders, and 12.09 for substance addiction disorders. *Id.* She assessed Plaintiff as having mild restriction of ADLs; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two extended episodes of decompensation. Tr. at 688. Dr. Clausen indicated Plaintiff was moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; and to interact appropriately with the general public. Tr. at 692–93. Dr. Clausen indicated Plaintiff was capable of understanding, remembering, and carrying out simple instructions, but was unable to understand, remember, and carry out detailed instructions. Tr. at 694. She suggested Plaintiff was able to maintain concentration and attention for periods of at least two hours. *Id.* She indicated Plaintiff would perform best in situations that did not require

ongoing public interaction, but found Plaintiff was able to be aware of normal hazards

and take appropriate precautions. *Id.* Dr. Clausen explained her findings as follows:

> Evidence used to complete rating is shown on p. 13 of PRTF. Medical
> source opinion of Dr. Custer in his 4/10 CE continues to hold great weight
> as although ct. has had multiple inpatient admissions, these admissions
> noted etoh intoxication as primary component and when examining
> documentation of 30-day period of sobriety ct. exhibits intact MSE and
> stable psychological functioning. Ct. had last incident of abuse in the initial
> period of claim one month prior to CE. As of CE of Dr. Custer of 4/10,
> Folstein minimental was 29/30 and mental status was fully intact. Ct. was
> stable substantiating that ct. is able to function adequately when free of
> substances. Dr. Custer opines primary problem is etoh dependence which
> has resulted in instability.
>
> Therefor, when ct. is compliant and abstinent, MER indicates she functions
> in a stable manner with the ability to interact socially and with intact cpp..
> At Recon level, ct. relapsed on ETOH multiple times and was admitted
> 7/10, 8/10, and 12/10—all admissions with ETOH intox and diagnosis as
> primary component. Upon last discharge of 12/10, ct. remained abstinent
> for 30 days, following up at MHC and note from Charleston MHC of 1/11
> indicates that ct. had remained sober was attending AA and working out.
> GAF was 58 with moderate limitations. Ct. exhibited intact mental status
> w/ fair judgment and insight and fair memory. ETOH was primary
> diagnosis. As of last documentation, ct. functions well with medication, and
> when abstinent from etoh.
>
> Claimant's allegations are partially credible, as although the MDI's could
> result in the alleged symptoms/limitations, their severity is clearly
> dependent on substance issues and ct. was reported to function in a stable
> manner when abstinent from substance and when compliant with treatment.
> Updated ADLs at recon indicate ct. is capable of performing ADLs,
> preparing simple meals, attending church, and working puzzles.
>
> Given totality of file evidence, it is concluded that claimant's symptoms
> and impairments currently are severe but would not preclude the
> performance of simple, repetitive work tasks in a setting that does not
> require on-going interaction with the public.

Tr. at 694.

16

On March 28, 2011, Plaintiff reported to Dr. Tang that she had remained sober since her last hospitalization. Tr. at 707–09. She complained of nightmares from Remeron and reported symptoms of irritability and anxiety. Tr. at 707. Plaintiff described her appetite and concentration as fair and denied suicidal and homicidal ideations and auditory and visual hallucination. *Id.* Plaintiff indicated her sleep had improved since she reduced her coffee consumption to one cup per day. *Id.* Plaintiff encouraged Dr. Tang to put her back on Geodon and Prozac. *Id.* She expressed no interest in starting Naltrexone to curb her alcohol cravings, but agreed to an increase in her Neurontin dosage to address her anxiety. *Id.* Dr. Tang assessed a GAF score of 55. Tr. at 708.

On May 2, 2011, Plaintiff informed Dr. Tang that she continued to remain sober. Tr. at 710. She indicated her mood and energy had improved and that she had been working. *Id.* Plaintiff reported dizziness and tiredness as a result of her increased dosage of Neurontin, and Dr. Tang reduced her dosage. *Id.* He assessed Plaintiff to have a GAF score of 64 and increased her dosage of Trazodone to help her to fall sleep. Tr. at 711.

Plaintiff followed up with Dr. Tang on June 6, 2011. Tr. at 712. Dr. Tang noted that Plaintiff had been assigned to a new case manager, following a conflict with her prior case manager. *Id.* Plaintiff reported drinking after learning that her daughter did not intend to invite her to her high school graduation and admitted to occasional use of her husband's Xanax. *Id.* She expressed suicidal ideations and stated that life was not worth living without alcohol or Klonopin. *Id.* Plaintiff requested a prescription for benzodiazepines, but Dr. Tang refused to prescribe them. *Id.* Plaintiff was unreceptive to

any of Dr. Tang's suggestions for treatment and indicated she would attempt to find another physician who would prescribe benzodiazepines. *Id.*

Plaintiff presented to Scott D. Christie, M.D. ("Dr. Christie"), at Charleston Mental Health on August 9, 2011. Tr. at 716–17. Dr. Christie described Plaintiff's mood as irritable and labile. Tr. at 716. He indicated Plaintiff denied a history of alcohol and prescription abuse and sought medication to help with her anxiety. *Id.* He discontinued Plaintiff's prescription for Trazodone and prescribed an increased dose of Neurontin. Tr. at 717.

Plaintiff participated well in group therapy sessions on August 16, 2011, August 23, 2011, August 30, 2011, September 6, 2011, September 13, 2011, and September 20, 2011. Tr. at 724, 726, 729, 731, 735, 737. Kimberly Logan, LPC ("Ms. Logan"), met with Plaintiff after the group session on August 23 and assessed Plaintiff as appropriately oriented. Tr. at 727. She indicated Plaintiff's mood and affect were calm and composed. *Id.* She described Plaintiff's thoughts as coherent and appropriate. *Id.* Plaintiff's memory and concentration were normal and intact. *Id.* Her intellectual functioning was average. *Id.* Plaintiff attended individual counseling sessions and made good progress on August 30, 2011, September 6, 2011, September 13, 2011, and September 20, 2011. Tr. at 728, 730.

On September 9, 2011, Plaintiff's case manager consulted with Dr. Christie about changing Plaintiff's antidepressant medication. Tr. at 733. The case manager indicated Plaintiff desired for Prozac to be discontinued because it had decreased her sexual desire. *Id.* Dr. Christie discontinued Plaintiff's prescription for Prozac and prescribed Zoloft. *Id.*

He asked the case manager to inform Plaintiff that she may continue to experience side effects from Prozac for another five weeks, but that she should not assume Zoloft caused the same side effects as Prozac. *Id.* On September 20, 2011, Ms. Logan indicated Plaintiff "is experiencing feelings and isn't using alcohol or becoming depressed." Tr. at 738. Plaintiff reported to Dr. Christie that she felt better since changing from Prozac to Zoloft. Tr. at 739. She reported a manageable level of anxiety and denied depressed mood. *Id.*

Plaintiff attended and actively participated in group therapy on October 4, 2011, October 11, 2011, October 18, 2011, October 25, 2011, and November 1, 2011. Tr. at 742, 743, 746, 753. On October 11, 2011, Plaintiff informed Ms. Logan that her son recently assaulted her when she attempted to stop him from playing a violent video game. Tr. at 744. Ms. Logan indicated Plaintiff was maintaining her sobriety, making safe decisions, and rebuilding her family relationships. *Id.*

On October 18, 2011, Ms. Logan completed a professional certification form for Plaintiff to obtain public transportation assistance. Tr. at 764–65. She indicated Plaintiff was diagnosed with severe bipolar disorder and PTSD and that she could experience unstable moods, erratic behavior, flashbacks, and difficulty focusing or functioning. Tr. at 764. Ms. Logan indicated Plaintiff's disability was permanent. *Id.* She indicated Plaintiff retained the abilities to give addresses and phone numbers upon request; recognize a destination or landmark; ask for, understand, and follow directions; safely and effectively travel through crowded facilities; and wait outside without support for 10 minutes. Tr. at 765.

Ms. Logan indicated Plaintiff continued to maintain her sobriety and cope well with stress and emotions on October 18, 2011, October 25, 2011, and November 1, 2011. Tr. at 745, 748. Plaintiff participated well in group therapy on October 18, 2011, and October 25, 2011. Tr. at 746, 747.

Plaintiff followed up with Dr. Christie on November 1, 2011. Tr. at 751–52. She reported increased stressors and some difficulty sleeping, but indicated she was exercising and receiving support from her family. Tr. at 751. Dr. Christie observed no abnormalities on examination and even noted that Plaintiff's judgment and insight were good. *Id.* He assessed Plaintiff to have a GAF score of 68. Tr. at 752.

Plaintiff followed up with Dr. Christie on January 3, 2012, and reported increased marital stress and fighting with her husband. Tr. at 1256. Dr. Christie indicated Plaintiff was not having major mood changes and that her complaints appeared to be related to situational stress. *Id.* Plaintiff indicated she remained sober and acknowledged that her situation would be worse if she resumed alcohol abuse. *Id.* Dr. Christie described Plaintiff's judgment as fair, but noted no other abnormalities on mental status examination. *Id.* He assessed Plaintiff to have a GAF score of 64. Tr. at 1257.

On February 7, 2012, Plaintiff reported to Dr. Christie that she had a major alcohol relapse two weeks earlier that resulted in a blackout, a fight with a police officer, and two-and-a-half days in jail. Tr. at 1254. She reported that she was attending regular meetings at Charleston Center, daily AA meetings, and a trauma support group. *Id.* Dr. Christie described Plaintiff's judgment as fair, but her insight as good. *Id.* He assessed Plaintiff to have a GAF score of 65. Tr. at 1255.

Plaintiff followed up with Dr. Christie on March 6, 2012, and reported that she was staying sober and that her medications were working well. Tr. at 1252. She indicated she was attempting to have the charges against her dropped or reduced. *Id.* Dr. Christie described Plaintiff's judgment and insight as fair and assessed a GAF score of 58. Tr. at 1252–53.

On May 1, 2012, Plaintiff reported to Dr. Christie that she was dealing with consequences of her relapse. Tr. at 1250. She requested that her medication dosage be increased. *Id.* Dr. Christie assessed a GAF score of 68. Tr. at 1251.

On July 12, 2012, Plaintiff reported to Dr. Christie that she was doing well, attending school, getting along with her family members, and had her driver's license reinstated. Tr. at 1248. She denied mood swings. *Id.*

Treatment notes from ECMC dated September 13, 2012, indicate Plaintiff experienced tonic-clonic seizures during a visit to Charleston Mental Health and in the hospital's emergency department. Tr. at 1126. Plaintiff denied alcohol use and her blood alcohol level was negative. Tr. at 1125–26. She indicated she stopped taking Geodon for two weeks, but resumed taking it two days earlier and took four tablets at once, as opposed to the prescribed dose of two tablets, twice a day. *Id.* Plaintiff appeared to be experiencing visual and auditory hallucinations. *Id.* A CT scan of Plaintiff's brain was normal. Tr. at 1137. An MRI showed no acute process, but indicated cerebral volume loss and mild chronic ischemic changes in the cerebral white matter. Tr. at 1156. Deborah S. Lay, D.O. ("Dr. Lay"), indicated it was unclear whether Plaintiff had a seizure disorder or if her seizure was the result of alcohol withdrawal. Tr. at 1125.

Plaintiff followed up with Dr. Christie on September 18, 2012. Tr. at 1245–47. She reported distress as a result of the ignition interlock device ("IID") on her vehicle. Tr. at 1245. Although Plaintiff denied drinking, she indicated her IID had registered alcohol on her breath several times and that she had been prevented from driving her vehicle on those occasions. *Id.* As a result, she was required to undergo further evaluation at Charleston Center. *Id.* Dr. Christie assessed a GAF score of 68. Tr. at 1246.

A clinical assessment from Charleston Center dated September 19, 2012, indicated Plaintiff's evaluation supported a diagnosis of alcohol dependence. Tr. at 1363. Although Plaintiff indicated she had not consumed alcohol since February 2012, she provided inconsistent explanations for the IID's failure, and the clinician indicated she believed Plaintiff continued to use alcohol. *Id.*

A progress summary from Charleston Mental Health dated September 21, 2012, indicates Plaintiff was no longer attending AA meetings. Tr. at 1240. Ms. Logan indicated Plaintiff reported that she was adhering to her medication schedule, attending classes, and improving in her daily self-care. *Id.*

Plaintiff was admitted to MUSC Medical Center November 24–27, 2012, following a seizure-related fall. Tr. at 1165. Plaintiff had an elevated blood alcohol level. *Id.* She endorsed some suicidal ideation while intoxicated, but denied suicidal ideation once sober. Tr. at 1165–66. Although physicians initially suspected Plaintiff may have sustained a T12 compression fracture, later testing revealed no fracture. Tr. at 1165. Plaintiff was instructed to resume use of Keppra, to follow up with Dr. Christie at Charleston Mental Health, and to visit the neurology clinic. Tr. at 1166.

Plaintiff presented to Mohit Datta, M.D. ("Dr. Datta"), at MUSC Health on January 15, 2013, to establish care for seizures. Tr. at 1213. Plaintiff reported having one generalized tonic-clonic seizure every three to four months. *Id.* Dr. Datta indicated Plaintiff's seizures always seemed to occur in the setting of alcohol abuse or withdrawal. Tr. at 1216. He recommended Plaintiff undergo a one hour sleep-deprived EEG and take 750 milligrams of Keppra twice daily. *Id.*

On January 18, 2013, Plaintiff presented to MUSC complaining that she had experienced a seizure the night before and that she continued to feel anxious and to have diarrhea and vomiting. Tr. at 1206–08. Daniel Boram Park, M.D., and William Wise Carroll, M.D., indicated Plaintiff's seizure threshold was lowered because of recent gastroenteritis. Tr. at 1208. They ordered Plaintiff to stop Keppra and start Depakote. *Id.*

Plaintiff was hospitalized at MUSC from January 31 to February 1, 2013, after presenting to the hospital with a sudden onset of left-sided facial droop and altered mental status. Tr. at 1193. Plaintiff indicated she had missed a dose of Depakote and had doubled her next dose. *Id.* She endorsed a history of regular drinking, but reported sobriety since January 1, 2013. Tr. at 1194. Plaintiff indicated she was a full-time student at Trident Tech. *Id.* Laboratory tests were positive for a urinary tract infection. *Id.* Video electroencephalogram ("EEG") showed generalized slowing, but no evidence of seizure activity. *Id.* Plaintiff responded poorly to Ativan with increased somnolence and worsened mental status. Tr. at 1195. Edward Lewis, III, M.D. ("Dr. Lewis"), indicated Plaintiff's altered mental status was likely due to an overdose of Depakote, urinary tract infection, and use of benzodiazepines. *Id.* Dr. Lewis indicated Plaintiff should follow up

23

with Dr. Christie at Charleston Mental Health and Gabriel Martz, M.D., at MUSC Neurology. *Id.*

On February 3, 2013, Plaintiff presented to MUSC's emergency department with complaints of worsened confusion, blurred vision, unsteady gait, and difficulty finding words. Tr. at 1180. Plaintiff's urine drug screen was positive for benzodiazepines, and Plaintiff indicated she took them to sleep. *Id.* Diana M. Mullis, M.D., indicated Plaintiff's symptoms were likely secondary to an unresolved urinary tract infection and benzodiazepine abuse. Tr. at 1186.

Plaintiff followed up with Dr. Christie on February 22, 2013. Tr. at 1243–44. She reported that she had remained sober since her accidental fall. Tr. at 1243. Dr. Christie assessed Plaintiff as having a GAF score of 68. Tr. at 1244. A progress summary indicates Plaintiff was no longer attending AA meetings twice weekly. Tr. at 1242. Plaintiff endorsed only one alcohol relapse between November 21, 2012, and February 19, 2013. *Id.* Ms. Logan indicated Plaintiff had not been able to attend her classes because of her multiple hospitalizations. *Id.*

State agency medical consultant Isabella McCall, M.D., reviewed the record and provided a physical RFC assessment on April 17, 2013. Tr. at 832–34. She assessed no physical limitations, but indicated Plaintiff should never climb ladders, ropes, or scaffolds; was limited to frequent balancing and climbing of ramps and stairs; and should avoid all exposure to hazards because of her seizure disorder. *Id.*

On April 22, 2013, state agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), completed a PRTF. Tr. at 830–31. He considered Listings 12.04 for

affective disorders, 12.06 for anxiety-related disorders, 12.08 for personality disorders, and 12.09 for substance addiction disorders. Tr. at 830. He assessed Plaintiff as having mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Neboschick also completed a mental RFC assessment. Tr. at 834–35. He indicated Plaintiff was moderately limited in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact with the general public. *Id.* He wrote the following:

> The claimant is able to understand and remember simple instructions. Sustain attention for simple structured tasks for periods of 2 hour segments. Adapt to changes. Would be best if they are infrequent and gradually introduced. Make simple work-related decisions. Maintain appropriate appearance and hygiene. Recognize and appropriately respond to hazards. Works best in structured, uncrowded situations that do not involve much direct, ongoing interaction w the public.

Tr. at 835.

Plaintiff followed up with Dr. Christie on April 23, 2013, and reported increased depression as a result of stressors with her children, brain injury, seizures, and inability to drive. Tr. at 1287. Plaintiff indicated she was maintaining her sobriety, but sought medication to decrease her anxiety. *Id.* Dr. Christie prescribed Luvox and Klonopin. *Id.* He assessed Plaintiff to have a GAF score of 66. Tr. at 1288.

On May 2, 2013, Plaintiff underwent an outpatient sleep-deprived EEG. Tr. at 1311. Her results were normal for her age in the awake, drowsy, and sleep states. *Id.* The

clinical correlation indicated the absence of epileptiform abnormalities, but did not preclude a clinical diagnosis of seizures. *Id.*

Plaintiff presented to Theodore M. Pappas, M.D. ("Dr. Pappas"), to establish primary care treatment on May 9, 2013. Tr. at 1263. Dr. Pappas observed no abnormalities on general examination. *Id.* He diagnosed anxiety and prescribed Klonopin. *Id.* He indicated Plaintiff should consider neuropsychiatric testing and instructed her to follow up in four to six weeks. *Id.* In an addendum to the treatment note, Dr. Pappas indicated he did not initially realize that Plaintiff was being seen by Dr. Christie and Dr. Datta. Tr. at 1264. He indicated he would forward his treatment notes to them. *Id.*

On May 28, 2013, Plaintiff presented to MUSC's emergency department on commitment papers after having a physically and verbally aggressive outburst at Charleston Mental Health. Tr. at 1299. Plaintiff had an argument with Ms. Parks after admitting that she was obtaining Klonopin from an outside facility. *Id.* Plaintiff began to scream, throw furniture, and was verbally aggressive. *Id.* Upon initial assessment at MUSC, Plaintiff had an elevated blood alcohol level. *Id.* Plaintiff reported daily use of "handfuls" of Klonopin. Tr. at 1302. Assessment was deferred until Plaintiff became sober. Tr. at 1299. Once Plaintiff was sober, her thoughts were lucid and she did not display any alterations in mental status. *Id.* Plaintiff denied suicidal ideations, but was unwilling to accept responsibility for her actions at Charleston Mental Health. *Id.* Diana O'Connell, MSW ("Ms. O'Connell"), indicated Plaintiff's thoughts were organized and that she did not appear manic or psychotic. *Id.* She determined Plaintiff presented no risk of harm to herself or others and, thus, did not meet the criteria for involuntary psychiatric

commitment. Tr. at 1300. She indicated Plaintiff had impaired functioning, poor control of anger and aggression, and issues with substance dependence. *Id.* She suggested Plaintiff would benefit from inpatient substance abuse treatment and found that she met the criteria for involuntary substance abuse treatment commitment. *Id.*

On May 31, 2013, Plaintiff was transported via ambulance to MUSC Health after she was found unconscious at the bottom of the steps outside her home. Tr. at 1294. Plaintiff complained of head pain and indicated she had been out drinking with friends prior to the fall. *Id.* Plaintiff had a laceration to her anterior forehead. Tr. at 1295. Her musculoskeletal range of motion and neurological functioning were normal. *Id.* Her mood and affect were normal, but her speech was slurred and her memory and cognition were impaired. Tr. at 1296. An MRI showed no evidence of acute traumatic injury to Plaintiff's cervical spine, but did indicate multilevel degenerative disc disease, worst at C6-7. Tr. at 1314. A CT of Plaintiff's brain indicated no acute intracranial abnormality, but did show multiple old left-sided facial fractures. Tr. at 1316. Plaintiff's laceration was repaired. Tr. at 1298. Adam Scott Turk, PAC, indicated Plaintiff would be discharged as soon as she was clinically sober. *Id.*

Plaintiff was admitted to MUSC Health from June 9 to June 10, 2013, after falling from her bed and experiencing confusion and difficulty speaking. Tr. at 1336. Plaintiff's Depakote level was undetectable. *Id.* A CT of Plaintiff's head showed no acute intracranial injury or fracture and indicated some decrease in the hematoma that was evident on the May 31, 2013, scan. Tr. at 1337. Keri Theresa Holmes-Maybank, M.D. ("Dr. Holmes-Maybank"), indicated Plaintiff's altered mental status was likely due to the

combination of medications she was taking and an overdose of those medications. Tr. at 1338. Although Plaintiff denied taking benzodiazepines and opiates, a urine drug screen was positive for both. Tr. at 1336. A phone call to Plaintiff's pharmacy revealed that she had filled prescriptions for Lortab, Tramadol, and Oxycodone, but had not filled her Depakote prescription since January. Tr. at 1338.

On June 12, 2013, Plaintiff presented to the emergency department at MUSC Health complaining of a head injury that occurred one day earlier. Tr. at 1331. She reported constant, mild head pain, blurred vision, disorientation, weakness, nausea, and memory loss. *Id.* Plaintiff was diagnosed with a closed head injury and referred to the traumatic brain injury ("TBI") clinic for further evaluation and management. Tr. at 1334.

Plaintiff presented to the emergency department at MUSC Health on June 13, 2013, complaining of difficulty with word-finding, multiple falls, weakness, and dizziness. Tr. at 1329. Although Plaintiff initially indicated she was unable to dress, walk, or write, she later admitted that she had bathed herself, dressed herself, and fixed her hair and makeup before presenting to the emergency department. *Id.*  Dr. Holmes-Maybank indicated that, although Plaintiff had experienced falls in the several weeks prior to her presentation, she had no evidence of a recent fall and her head CT was unchanged. Tr. at 1330. Dr. Holmes-Maybank indicated Plaintiff's frequent emergency department visits appeared to involve substance abuse. *Id.* She informed Plaintiff that hospitalization was not indicated and observed that Plaintiff "was seen walking out of the ER in her platform heels unassisted and without difficulty and without any abnormal gait." *Id.*

On July 26, 2013, state agency consultant Judith Von, Ph. D. ("Dr. Von"), completed a PRTF. Tr. at 847–48. She reviewed the record and considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, 12.08 for personality disorders, and 12.09 for substance addiction disorders. Tr. at 847. Dr. Von assessed Plaintiff as having mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 848. Dr. Von also completed a mental RFC. Tr. at 851–53. She found Plaintiff to be moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. *Id.* She wrote the following:

> The claimant is able to understand and remember simple instructions. Sustain attention for simple, structured tasks for periods of 2 hour segments. Adapt to changes. Would be best if they are infrequent and gradually introduced. Make simple work-related decisions. Maintain appropriate appearance and hygiene. Recognize and appropriately respond to hazards. Works best in structured, uncrowded situations that do not involve much direct, ongoing interaction with the public.

Tr. at 853.

State agency medical consultant Mary Lang, M.D., reviewed the record and provided a physical RFC assessment on August 9, 2013. Tr. at 849–51. She indicated Plaintiff had no exertional limitations, but was limited to occasional climbing of ramps and stairs; frequent balancing; should avoid climbing ladders, ropes, and scaffolds; and should avoid all exposure to hazards. *Id.*

Plaintiff presented to Dr. Christie on December 9, 2013. Tr. at 1381–83. She denied substance use since moving to James Island, but indicated she had not taken any medications since being discharged. Tr. at 1381. She indicated she had presented to Charleston Center that morning because she felt she was "on the verge of losing it" and resuming substance abuse. *Id.* Dr. Christie indicated Plaintiff's judgment was poor and her thought process was distractible, but her insight was fair and her mental status examination was otherwise normal. Tr. at 1383. He assessed a GAF score of 60. *Id.*

Plaintiff followed up with Dr. Christie on May 13, 2014. Tr. at 1384–85. They discussed Plaintiff's recent hospitalization related to alcohol abuse and her subsequent admission to Morris Village for detox. Tr. at 1384. Plaintiff complained of nausea related to pancreatitis. Tr. at 1384. She requested a prescription for Ativan, but Dr. Christie was unwilling to prescribe it. *Id.* Plaintiff became upset and left the office. *Id.* Dr. Christie described Plaintiff's thoughts as goal-directed, but illogical. Tr. at 1385. He indicated Plaintiff had fair insight, but poor judgment. *Id.* He assessed a GAF score of 62. *Id.*

On June 24, 2014, Ms. Logan completed a professional certification for Plaintiff to receive transportation assistance services. Tr. at 1378–79. She identified Plaintiff's impairments as anxiety, cognitive difficulties, and TBI. Tr. at 1378. She indicated Plaintiff's anxiety and cognitive difficulties were severe, and the effects of her TBI were profound. *Id.* She indicated Plaintiff could give addresses and telephone numbers upon request and safely and effectively travel through crowded facilities, but could only sometimes recognize a destination or landmark and ask for, understand, and follow directions. Tr. at 1379.

Plaintiff followed up with Dr. Christie on August 5, 2014. Tr. at 1386. She reported she had been attending appointments at Charleston Center and staying clean. *Id.* She was somewhat guarded about her relationship issues, but reported to her case manager that her husband had beaten her up. *Id.* Plaintiff indicated her nightmares had decreased on Prazosin, and Dr. Christie restarted her on the medication. Tr. at 1386–87 Plaintiff also sought medication for sleep, but Dr. Christie recommended over-the-counter Melatonin. Tr. at 1386. Dr. Christie indicated Plaintiff's mental status was normal, but that her judgment and insight were fair. *Id.* He assessed a GAF score of 65. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    2011 Hearing

At the hearing on December 14, 2011, Plaintiff testified she last worked for Goodwill Industries for eight months in 2008. Tr. at 29. She indicated she worked as a disabled client of the organization, but stopped working after a bipolar episode. *Id.* She stated she had a boxcutter in her hand, and her employer perceived her to be threatening others. Tr. at 35. She indicated she was compliant with her medications and was not abusing alcohol at the time of the incident. Tr. at 36.

Plaintiff testified that she had experienced symptoms of bipolar disorder for most of her life, but was not diagnosed with the impairment until 1997. Tr. at 29–30. Plaintiff confirmed a history of substance abuse and indicated she was institutionalized on

multiple occasions throughout the prior 15-year period. Tr. at 30. She stated she had been hospitalized three or four times since 2008 and that her last two hospitalizations were for suicide attempts. *Id.* Plaintiff described symptoms of severe depression, isolation, and over-medication prior to her suicide attempts. *Id.* She indicated she had received some help with her substance abuse and served as an alumni member on the council of the Charleston Center. Tr. at 31. She stated she had been sober since November 29, 2010, with the exception of one incident three months prior to the hearing. *Id.*

Plaintiff testified she received weekly treatment for her mental health problems through both group and one-on-one therapy sessions. Tr. at 31, 37. She indicated she was prescribed Neurontin for anxiety and seizures, Geodon for psychotic behavior, and Trazodone for sleep and depression. Tr. at 38. She stated her treatment was helpful, but she continued to experience good and bad days. Tr. at 31. She indicated she had difficulty going to the grocery store alone and experienced forgetfulness and difficulty focusing. Tr. at 32. Plaintiff described problems with panic attacks, anxiety, and PTSD as a result of an attack four years earlier. *Id.* She indicated she experienced nightmares and flashbacks and feared being alone at night. Tr. at 32–33. She indicated she was easily distracted and had difficulty completing tasks. Tr. at 40.

Plaintiff testified she experienced side effects from her medications and that her medication levels frequently needed to be monitored and adjusted. Tr. at 34–35. She endorsed medication side effects that included severe dizziness and fatigue. Tr. at 35.

Plaintiff testified she was living rent-free with a friend and the friend's elderly mother. Tr. at 33. She stated she helped her friend's mother and did some household

chores. *Id.* She indicated she did some light gardening and cooking. Tr. at 38. Plaintiff

testified she was able to engage in self-care tasks. Tr. at 33. She indicated she frequently

read, studied the Bible, and watched church services on television. Tr. at 33, 39. She

stated she used public transportation, but did not drive because of her bipolar disease,

seizures, and PTSD. *Id.* She later indicated that her driver's license was suspended in July

2010, after she was arrested for DUI. Tr. at 40. She indicated she did not have custody of

her children, but regularly visited with them and other family members. Tr. at 34, 39.

Plaintiff testified she had attempted to find work, but that her history of alcoholism

had prevented her from being hired. Tr. at 39.

### ii.    2014 Hearing

Plaintiff testified she was 5'5" tall and weighed 100 pounds. Tr. at 787. She

indicated she lived with a friend. *Id.* She stated her last job was as a supervisor in the

galley at the naval weapons station. Tr. at 788. She indicated she stopped working

because the job was too physically and emotionally taxing. Tr. at 788–89. She testified

she fell while working and was worried about falling again. Tr. at 790. She indicated her

PTSD and flashbacks caused her difficulty in completing her job. Tr. at 791.

Plaintiff testified she was unable to perform a low stress job because she tired

easily. Tr. at 792. Plaintiff indicated her anxiety resulted in difficulty with cognitive

functioning. Tr. at 792–93. She stated she experienced confusion and memory problems.

Tr. at 793. She also endorsed a history of seizures and stated she had epilepsy. Tr. at 796.

Plaintiff admitted to a history of alcohol abuse, but stated she stopped drinking in

February. Tr. at 793. She indicated her longest period of sobriety was three years. *Id.* She

stated she continued to experience mental health symptoms, fatigue, confusion, and cognitive problems during periods of sobriety. *Id.* She testified she sometimes had difficulty getting along with others and controlling her anger. Tr. at 797–98. She indicated she was complying with treatment recommendations and taking her medications. Tr. at 794–95. She stated she took Depakote, Neurontin, and Phenobarbital. Tr. at 797.

Plaintiff testified she cooked and performed household chores. Tr. at 795. She stated she did laundry. *Id.* She indicated she attended church and church events and AA meetings. Tr. at 795–96. She testified she had friends in her church and participated in activities with her friends, including a recent trip to the market on King Street. Tr. at 796. She indicated she attended counseling three times a week. Tr. at 797.

### b. Vocational Expert Testimony

#### i. 2011 Hearing

Vocational Expert ("VE") J. Adger Brown, Jr., MA, CDMS, reviewed the record and testified at the hearing. Tr. at 41–45. The VE categorized Plaintiff's PRW as a caterer, *Dictionary of Occupational Titles* ("*DOT*") number 187.167-016, as light with a specific vocational preparation ("SVP") of seven; a book sales representative, *DOT* number 277.357-022, as light with an SVP of five; and a grocery clerk supervisor, *DOT* number 211.137-010, as light with an SVP of seven. Tr. at 42. The ALJ described a hypothetical individual of Plaintiff's vocational profile who had no exertional, postural, or manipulative limitations; should avoid exposure to unprotected heights; was limited to simple, routine, repetitive tasks; could handle only occasional changes in the work

setting; and could only occasionally interact with the public. Tr. at 42. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light and unskilled jobs as a counter clerk, *DOT* number 249.366-010, with 1,100 positions in South Carolina and 82,000 positions in the United States; a survey worker, *DOT* number 205.367-054, with 750 positions in South Carolina and 69,000 positions in the United States; and a stock and inventory clerk, *DOT* number 221.587-018, with 1,300 positions in South Carolina and 79,000 positions in the United States. Tr. at 42–43. The VE pointed out that the first two positions identified would require periodic, but not ongoing interaction with the public for short periods of time. Tr. at 43.

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited as described in the first hypothetical question, but could not perform production-rate or pace work or have interaction with the public. Tr. at 43. The VE testified the individual could perform the job of stock and inventory control clerk identified in response to the previous question, as well as light jobs with an SVP of two as a quality control examiner, *DOT* number 739.687-102, with 3,900 positions in South Carolina and 120,000 positions in the United States and a product tester and weigher, *DOT* number 732.587-018, with 240 positions in South Carolina and 12,000 positions in the United States. Tr. at 43–44.

The ALJ asked the VE to assume the individual would be off-task for more than two hours per day due to a combination of medical conditions. Tr. at 44. He asked if there would be jobs available. *Id.* The VE testified there would be no jobs. *Id.*

The ALJ asked the VE to assume the individual would be unable to concentrate on a task for more than an hour at a time. *Id.* The VE testified that it would be acceptable for an individual to concentrate on a task for an hour and then to be off task for a short period, but that an individual could not be off task for more than an hour-and-a-half. *Id.*

The ALJ asked if there would be jobs available if the individual would be absent from work more than two days per month. *Id.* The VE testified that, if the absences occurred on a consistent basis, the individual would be unable to work at substantial gainful activity levels. Tr. at 45.

### ii.    2014 Hearing

VE Arthur Schmitt, Ph. D., reviewed the record and testified at the hearing. Tr. at 799–801. The VE categorized Plaintiff's PRW as a caterer, *DOT* number 290.477-014, as medium with an SVP of four; a sales director, *DOT* number 372.667-034, as light with an SVP of four; a secretary, *DOT* number 201.362-030, as sedentary with an SVP of six; and a kitchen supervisor, *DOT* number 319.137-026, as light per the *DOT*, but medium as performed, with an SVP of seven. Tr. at 799–800. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work with the following limitations: must avoid concentrated use of moving machinery; must avoid moderate exposure to unprotected heights; limited to simple, routine, repetitive tasks in a low-stress work environment free of fast-paced production requirements and involving

36

only simple work-related decisions with few, if any, workplace changes; and can only have occasional interaction with the public. Tr. at 800. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW, but could perform other unskilled jobs with an SVP of two as a janitor, *DOT* number 381.687-018, with 27,600 positions in South Carolina and 2,090,000 positions in the national economy; a laundry operator, *DOT* number 361.686-014, with 3,100 positions in South Carolina and 211,000 positions nationally; and an egg packer, *DOT* number 920.687-014, with 3,100 positions in South Carolina and 211,000 positions nationally. Tr. at 800–801.

The ALJ next asked the VE if there would be jobs available if the individual were to be off task for more than an hour per day in addition to regularly-scheduled breaks. Tr. at 801. The VE testified that such a restriction would eliminate all jobs in the national economy. *Id.*

The ALJ asked if there would be jobs available if the individual were to miss more than two days of work per month on a regular basis. *Id.* The VE testified that limitation would eliminate all jobs in the national economy. *Id.*

### 2. The ALJ's Findings

In his decision dated October 8, 2014, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 9, 2009, the application date (20 CFR 416.971 *et seq.*).
2. The claimant has the following severe impairments: affective mood disorder, borderline personality disorder, posttraumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), and drug and alcohol abuse disorder (20 CFR 416.920(c)).

37

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 416.967(c). Specifically, the claimant can lift and carry up to 50 pounds occasionally and 25 pounds frequently, sit for 6 hours in an 8-hour day and stand and/or walk for 6 hours in an 8-hour day. The claimant must avoid concentrated use of moving machinery, and she must avoid moderate exposure to unprotected heights. The claimant is limited to simple, routine and repetitive tasks. She is limited to a work environment free of fast-paced production requirements, requiring only simple, work-related decisions with few, if any, workplace changes. Additionally, she is limited to a low-stress environment with only occasional interaction with the public.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on October 2, 1966 and was 43 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since November 9, 2009, the date the application was filed (20 CFR 416.920(g)).

Tr. at 766–83.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      the ALJ did not consider and adequately explain the combined effects of Plaintiff's impairments;

2)    the ALJ did not properly evaluate the record in assessing Plaintiff's mental impairments;

3)    the ALJ did not properly evaluate the impact of Plaintiff's polysubstance abuse on her physical and mental impairments; and

4)    the ALJ did not adequately assess Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Evaluation of Combined Impairments

Plaintiff argues the ALJ failed to make particularized findings regarding the cumulative effects of her mental impairments. [ECF No. 14 at 31–32]. She maintains the ALJ did not provide an adequate explanation that reflected a consideration of her combination of impairments. [ECF No. 19 at 2–3].

The Commissioner argues the ALJ demonstrated that he considered Plaintiff's impairments in combination by summarizing the medical evidence and indicating he considered Plaintiff's impairments in combination. [ECF No. 17 at 8]. She contends the ALJ specifically considered Plaintiff's combination of impairments in concluding that her impairments did not meet or equal a Listing. *Id.* at 9. She maintains the ALJ's RFC assessment considered all the evidence, evaluated Plaintiff's impairments in combination,

and accounted for all of Plaintiff's credibly-established physical and mental limitations. *Id.*

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and her disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.* This court subsequently specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

The ALJ found that Plaintiff's severe impairments included affective mood disorder, borderline personality disorder, PTSD, OCD, and drug and alcohol abuse disorder. Tr. at 771. The ALJ found that Plaintiff's seizure disorder, left shoulder pain,

43

and hypertension were non-severe impairments. Tr. at 772. He found that "[t]he severity of the claimant's mental impairments, consider singly and in combination, do not meet or equal the criteria of listings12.04, 12.06, 12.08, and 12.09. *Id.*

The ALJ noted that "the claimant's psychiatric symptoms were generally stable when she was compliant with prescribed medications and abstained from alcohol and substance use." *See* Tr. at 775. He later explained his evaluation of Plaintiff's impairments in combination as follows:

> I have considered the claimant's mental impairments and subjective reports of difficulty concentrating and anger-management problems in limiting her to unskilled work in a low-stress environment free of fast-paced production requirements, with few workplace changes, and only occasional interaction with the public. However, there are not objective abnormalities in the medical record during the periods when the claimant is sober to suggest that she has greater limitations than those set forth above.

Tr. at 778. He later noted that he restricted the amount Plaintiff could lift and carry and be exposed to hazards and unprotected heights based on her history of seizure disorder and her substance abuse. Tr. at 781. Finally, the ALJ indicated that he limited the claimant to unskilled work with limited interactions with others in a low-stress environment with few, if any, workplace changes based on Plaintiff's mental disorders and history of alcohol and substance abuse. *Id.*

A review of the decision as a whole reveals that the ALJ considered the effects of all of Plaintiff's credibly-established impairments in combination. *See* Tr. at 774–81. The ALJ explained that his imposition of a restriction to "unskilled work in a low-stress environment free of fast-paced production requirements, with few workplace changes, and only occasional interaction with the public" was intended to accommodate Plaintiff's

44

combination of mental impairments. *See* Tr. at 778. He explained that Plaintiff's symptoms were only of greater severity for short periods when Plaintiff was either under the influence of alcohol, abusing medication, or non-compliant with her prescribed medications, thus reflecting a consideration of Plaintiff's alcohol and drug abuse disorder in combination with her mental impairments. *See id.* He specifically considered Plaintiff's history of seizure disorder in combination with her alcohol and substance abuse in restricting her to lifting and carrying 50 pounds occasionally and up to 25 pounds frequently and in excluding work that required exposure to unprotected heights and hazards. *See* Tr. at 781. He accounted for Plaintiff's mental disorders and alcohol and substance abuse in combination in limiting her to unskilled work with limited interaction with others in a low-stress environment with few workplace changes. *See id.* In light of the foregoing, the undersigned recommends the court find the ALJ considered Plaintiff's impairments in combination and explained his RFC assessment and ultimate disability determination in accordance with the Fourth Circuit's requirement in *Walker*.

### 2.     Evaluation of Mental Impairments

Plaintiff argues the ALJ cherry-picked her GAF scores to support his conclusion that her mental impairments were not disabling. [ECF No. 14 at 40]. She contends that her GAF scores varied widely and that the record failed to explain their fluctuation. *Id.* at 41. She maintains that GAF scores should not be used to determine if an individual is disabled. *Id.* She argues that in discounting Plaintiff's low GAF score in February 2010, the ALJ impermissibly gave a medical opinion. [ECF No. 19 at 8].

The Commissioner argues the ALJ thoroughly detailed Plaintiff's GAF scores throughout the relevant period. [ECF No. 17 at 15]. She maintains that the ALJ did not look at the GAF scores alone, but also looked to the mental status examination findings that accompanied the GAF scores and Plaintiff's longitudinal functioning. *Id.*

A GAF score of 21–30 reflects behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends). *DSM-IV-TR*. A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF score of 51–60 indicates "moderate symptoms (e.g., circumstantial speech and occasional panic attacks) OR moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [and] has some meaningful

interpersonal relationships." *Id.* GAF scores above 70 generally represent minimal, transient, or absent symptoms with little, if any, impairment to social, occupations, or school functioning. *Id.*

The Commissioner has explained that the GAF scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01, 50764–65 (Aug. 21, 2000). A GAF score may reflect the severity of a claimant's functioning or his impairment in functioning at the time the GAF score is assessed, but it is not meaningful without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning."). Thus, it is necessary for the ALJ to look beyond the GAF score to the individual's level of functioning at the time the GAF score was assessed to determine if the two are consistent.

The ALJ indicated Plaintiff had a relatively normal mental status examination upon admission to MUSC's Institute of Psychiatry in December 2009 and denied suicidal or homicidal ideations once sober. Tr. at 775. He recognized that Plaintiff was assigned a low GAF score of 45 during a visit to Charleston Mental Health in February 2010, but noted that the record indicated she was engaging in ongoing alcohol dependence and was not entirely compliant with her prescribed medications. *Id.* He indicated that Plaintiff's GAF score was 65 in April 2010 and her mental status examination was normal, except for some fleeting suicidal thoughts. *Id.* The ALJ noted that Plaintiff denied suicidal and

47

homicidal ideations and psychotropic symptoms, had a normal cognitive examination, was alert and fully-oriented, performed serial sevens, followed a three-step command, and scored 29 of 30 points on the Folstein MMSE during Dr. Custer's examination in April 2010. *Id.* He acknowledged that Plaintiff was psychiatrically hospitalized in July 2010 secondary to suicidal ideations, but pointed out that Plaintiff was intoxicated at the time of admission and that her symptoms stabilized with alcohol detoxification. Tr. at 776. He noted that Plaintiff reported less depression, had a normal mental status examination, and was assigned a GAF score of 60 in September 2010. *Id.* The ALJ acknowledged that Plaintiff again reported suicidal ideations in October and December 2010, but pointed out that she was intoxicated on both occasions. *Id.* He indicated Plaintiff's GAF scores on discharge ranged from 61 to 65, which represented only mild limitations in social or occupational functioning and suggested her symptoms improved with her sobriety. *Id.*

The ALJ found that in January and March 2011, Plaintiff's symptoms had improved with sobriety and medication compliance and she had essentially normal mental status examinations and moderate GAF scores of 55 and 58. *Id.* The ALJ acknowledged that by May 2011, Plaintiff reported doing well, having less anxiety, and working. *Id.* He further indicated Plaintiff's mental status examination was normal and her GAF score of 61 represented mild limitations. *Id.* He noted Plaintiff's alcohol relapse in June 2011, but indicated her GAF score suggested only moderate symptoms and her mental status examination was benign. Tr. at 777.

The ALJ recognized that Plaintiff reported increased situational stressors in January 2012, but pointed out that her mental status examination was normal and that her GAF score of 64 represented only mild limitations. *Id.* He cited another alcohol relapse in February 2012, but noted that Plaintiff's mental status examination was normal and that her GAF score was 65. *Id.* He indicated that Plaintiff's GAF score declined to 58 in March 2012, which reflected moderate symptoms, but noted that her mental status examination was normal, except for her judgment and insight, which were described as fair. *Id.* The ALJ recounted that by May 2012, Plaintiff reported only mild anxiety and had a normal mental status examination and a GAF score of 68, which represented only mild symptoms, and by July 2012, Plaintiff was enrolled in school, getting along well with family, and had a normal mental status examination and a GAF score of 85, which indicated minimal or absent symptoms. *Id.* The ALJ recognized that Plaintiff complained of visual and auditory hallucinations in September 2012, but that she was noncompliant with her medication at the time. *Id.* He pointed out that Plaintiff's mental status examination was normal later in September and that her doctor assessed a GAF score of 68, which suggested only mild symptoms. *Id.* The ALJ acknowledged that Plaintiff's psychiatrist assessed a lower GAF score of 54 in November 2012, but that Plaintiff was noncompliant with her medications at the time because she indicated she was tired of taking them. *Id.*

The ALJ reflected that in February 2013, Plaintiff was assigned GAF scores of 60 and 68, which reflected only mild to moderate limitations and her mental status examinations indicated no suicidal or homicidal ideations, euthymic mood, linear and

logical thought processes, and grossly intact memory. Tr. at 777–78. He acknowledged Plaintiff's difficulty with word-finding, but pointed out that Plaintiff's urine drug screen was positive for benzodiazepines at the time. Tr. at 778. He indicated Plaintiff was assessed a mild GAF score of 66 in April 2013 and had a normal mental status examination, except for a notation of depressed mood. *Id.* The ALJ recognized Plaintiff's presentation to the emergency department on commitment papers in May 2013 after her outburst at Charleston Mental Health, but pointed out that Plaintiff's urine drug screen was positive for benzodiazepines and opiates at the time and that she admitted to taking handfuls of Klonopin. *Id.* He indicated that, once Plaintiff was sober, she denied suicidal or homicidal ideations. *Id.* He noted that Plaintiff reported some increased psychiatric symptoms in December 2013, but also admitted she was noncompliant with her prescribed medications. *Id.* Despite Plaintiff's complaints of psychiatric symptoms, the ALJ indicated she was assessed a GAF score of 60, which reflected only moderate symptoms. *Id.* He acknowledged that Plaintiff exhibited medication-seeking behavior in May 2014 and left her psychiatrist's office upset because he would not prescribe Ativan, but noted that the psychiatrist assessed a GAF score of 62, which was consistent with a relatively unremarkable mental status examination and only mild symptoms. *Id.* Finally, the ALJ noted that Plaintiff's mental status examination was completely normal in August 2014 and that her psychiatrist assessed a GAF score of 64, which was consistent with mild symptoms. *Id.*

The ALJ discussed specific instances in which Plaintiff demonstrated more significant symptoms and lower GAF scores were assessed. *See* Tr. at 779. He

acknowledged that Plaintiff presented to Morris Village with a GAF score of 30 in March 2010, but that Plaintiff was dependent on alcohol and noncompliant with recommended treatment at that time. *Id.* He indicated that Plaintiff's July 2010 hospitalization for suicidal ideation occurred in the context of alcohol intoxication and that Plaintiff denied suicidal ideations after she became sober. *Id.* He noted that Plaintiff's suicidal gestures in October and December 2010 also occurred while she was under the influence of alcohol. *Id.* He indicated the record reflected improved mental status and increased GAF scores while Plaintiff was attending AA meetings and maintaining sobriety throughout the early part of 2011. *Id.* He recognized that Plaintiff experienced a relapse in July 2011, but noted that it only resulted in moderate symptoms and a moderate reduction in her functional abilities. *Id.* The ALJ indicated that Plaintiff's later GAF scores reflected no more than moderate symptoms and limitations and that declines in Plaintiff's functional abilities were generally associated with acute periods of intoxication or substance abuse. *Id.*

The undersigned's review of the evidence reveals that the ALJ did not rely solely on the GAF scores, but considered Plaintiff's GAF scores in conjunction with the mental status assessments and Plaintiff's reported symptoms. As detailed above, the ALJ thoroughly and logically explained how he considered each GAF score in the context of the treatment notes. *See* Tr. at 775–79. After having adequately explained his reasons for accepting most of the assessed GAF scores, the ALJ concluded that the vast majority of the scores reflected mild-to-moderate symptoms and limitations. *See* Tr. at 778.

The undersigned has thoroughly reviewed the medical evidence of record and is unable to find support for Plaintiff's claim that the ALJ selectively cited GAF scores to support his conclusion. Although the ALJ did not cite every GAF score in the record, the evidence supports his conclusion that the majority of the GAF scores assessed ranged from 51 to 70, and were, therefore, consistent with mild to moderate symptoms or difficulty in social or occupational functioning. *See* Tr. at 430 (GAF score of 40 on November 19, 2009), 498 (GAF score of 55 on December 15, 2009), 474 (GAF score of 55 on January 20, 2010), 514 (GAF score of 45 on February 1, 2010), 530 (GAF score of 30 on February 18, 2010), 546 (GAF score of 65 on April 27, 2010), 636 (GAF of 50 on July 27, 2010), 588 (GAF score of 60 on September 3, 2010), 668 (GAF of 25 on December 3, 2010), 662 (GAF score of 60–65 on December 14, 2010), 676 (GAF score of 58 on January 24, 2011), 708 (GAF score of 55 on March 28, 2011), 711 (GAF score of 64 on May 2, 2011), 713 (GAF score of 58 on June 6, 2011), 717 (GAF score of 57 on August 9, 2011), 740 (GAF score of 66 on September 20, 2011), 752 (GAF score of 68 on November 1, 2011), 1257 (GAF score of 63 on January 3, 2012), 1255 (GAF score of 65 on February 7, 2012), 1253 (GAF score of 58 on March 6, 2012), 1251 (GAF score of 68 on May 1, 2012), 1249 (GAF score of 85 on July 12, 2012), 1246 (GAF score of 68 on September 18, 2012), 1244 (GAF score of 68 on February 22, 2013), 1288 (GAF score of 66 on April 23, 2013), 1305 (GAF score 45 on May 28, 2013), 1382 (GAF score of 60 on December 9, 2013), 1385 (GAF score of 62 on May 13, 2014), 1387 (GAF score of 65 on August 5, 2014); *see also DSM-IV-TR*.

The undersigned's review also reveals no error in the ALJ's assessment that declines in Plaintiff's GAF score suggesting more severe symptoms occurred in the context of alcohol or drug abuse or failure to take medication as prescribed. *See* Tr. at 430 (GAF score of 40 assessed when Plaintiff presented with a blood alcohol level of 491), 513–14 (GAF score of 45 assessed when Plaintiff admitted she was not taking all of her medications), 529–31 (GAF score of 30 assessed upon admission to Morris Village when Plaintiff admitted she had taken Valium and later admitted that she had been abusing alcohol (Tr. at 568)), 635–36 (GAF score of 50 assessed when Plaintiff presented to hospital with suicidal ideations and blood alcohol level of 468 (Tr. at 595)), 667–68 (GAF score of 25 assessed when Plaintiff admitted to Palmetto Behavioral Health for overdose on alcohol and Xanax), 1302–05 (GAF score of 45 assessed when Plaintiff presented to MUSC with blood alcohol level of 229 and urine drug screen positive for benzodiazepines and opiates).

Finally, the undersigned finds no support for Plaintiff's assertion that the ALJ impermissibly provided a medical opinion about Plaintiff's low GAF scores in February 2010. The record corroborated the ALJ's finding that Plaintiff was abusing substances and failing to follow prescribed treatment. *See* Tr. at 513 (Plaintiff admitted to Ms. Boyd that she had not been taking some of her prescribed medications on February 1, 2010), 529 (Plaintiff admitted to Dr. Carr on February 18, 2010, that she had taken Valium the night before), 568 (Plaintiff admitted to Dr. Custer that she had resumed drinking after being discharged from MUSC and was arrested for DUI on January 27, 2010). Although the ALJ indicated he gave the assessed GAF score of 45 on February 1, 2010, little

weight because it was not "an accurate representation" of Plaintiff's "mental health in the absence of alcohol and with medication compliance" (Tr. at 775), the ALJ's finding was not a personal conjecture, but was instead based on Dr. Custer's opinion. *See* Tr. at 780 ("As for the opinion evidence, great weight has been given to the April 2010 opinion of Dr. Custer that with abstinence from alcohol and improved compliance with psychiatric treatment, the claimant's functioning would significantly improve.").

Although the ALJ placed significant emphasis on the GAF scores in the record, he did not rely on them without also considering their context. He provided significant support for each determination he made regarding Plaintiff's functioning at the time that the GAF score was assessed. *See* Tr. at 775–78. After having thoroughly reviewed the entire record, the ALJ assessed the limitations that he found to be supported by the longitudinal treatment history. *See* Tr. at 778 (concluding that Plaintiff's mental impairments limited her to unskilled work in a low-stress environment free of fast-paced production requirements, with few workplace changes, and only occasional interaction with the public). In light of the foregoing, the undersigned recommends the court find that substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairments did not render her incapable of performing all work activity.

3.    Evaluation of Polysubstance Abuse

Plaintiff argues the ALJ failed to comply with the requirements of SSR 13-2p[7] in evaluating the impact of polysubstance abuse. [ECF No. 14 at 32]. She maintains that it is

---

[7] Plaintiff initially indicated the ALJ failed to comply with the requirements of SSR 02-1p in evaluating Plaintiff's substance addiction disorder. See ECF No. 14 at 32. However,

impossible to segregate her polysubstance abuse from her mental impairments. *Id.* at 34–37. She contends the ALJ did not cite sufficient evidence to support his conclusion that her impairments were not disabling. *Id.* at 37. Plaintiff argues that the record refutes the ALJ's conclusion that she was never disabled, even when her substance abuse was considered with her other impairments. [ECF No. 19 at 4]. She maintains the ALJ should not have relied on her statements as evidence of periods of sobriety because the record proved her unreliable. *Id.* at 4–5.

The Commissioner argues Plaintiff's emphasis on SSR 13-2p is misplaced because it does not pertain to the situation in which an individual is disabled as a result of substance abuse. [ECF No. 17 at 9]. She argues that a 1996 amendment to the Social Security Act prohibits the Commissioner from deeming an individual disabled if drug and alcohol abuse is "a contributing factor material to the Commissioner's determination that the individual is disabled." *Id.* at 9–10, citing 42 U.S.C. § 1382c(a)(3)(J). The Commissioner maintains that this case does not require a determination under SSR 13-2p as to whether drug or alcohol abuse is material because the ALJ did not find that Plaintiff's impairments were disabling. *Id.* at 10.

An individual over the age of 18 is considered to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

---

in her reply brief, Plaintiff acknowledged that reference to SSR 02-1p was a scrivener's error and that she meant to reference SSR 13-2p. *See* ECF No. 19 at 3.

42 U.S.C.A. § 1382c(3)(A). "Notwithstanding subparagraph (A), an individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 1382c(a)(3)(J).

To determine whether alcoholism or drug addiction is a contributing factor material to the determination that an individual is disabled, the ALJ must attempt to determine if the individual would meet the SSA's definition of disability if she were not using drugs or alcohol. SSR 13-2p, ¶ 2. Specific instructions are set forth in SSR 13-2p for determining whether drug and alcohol abuse are material to the determination that an individual is under a disability.[8] However, the ALJ is not required to determine if the individual would be disabled if she were not using drugs or alcohol unless (1) he finds that she has a substance use disorder and (2) he determines that she is disabled considering all impairments, including the substance use disorder. SSR 13-2p, ¶ 3.

---

[8] The drug and alcohol abuse evaluation framework set forth in SSR 13-2p includes a six-step evaluation process. *See* SSR 13-2p. The decision maker must consider the following: (1) whether the claimant has drug addiction or alcoholism; (2) whether the claimant is disabled considering all impairments, including the drug addiction or alcoholism; (3) whether drug addiction or alcoholism is the only impairment; (4) whether the claimant's other impairment or combination of impairments are disabling by themselves while the claimant is dependent upon or abusing drugs or alcohol; (5) whether the drug abuse or alcoholism causes or affects the claimant's other medically-determinable impairment(s); and (6) whether the claimant's other impairment(s) would improve to the point of nondisability in the absence of drug and alcohol abuse. However, if a decision regarding disability may be made at any step, it is unnecessary for the decision maker to proceed to the next step.

Although the ALJ found that Plaintiff's severe impairments included drug and alcohol abuse disorder, he determined that Plaintiff's impairments were not disabling. *See* Tr. at 772, 781. In reaching this conclusion, the ALJ referenced multiple medical records from 2009 through 2013 and found that these records reflected mild-to-moderate psychiatric symptoms, outside of periods of acute intoxication or misuse of medication. Tr. at 775–78.

The undersigned recommends the court find the ALJ adequately considered Plaintiff's drug and alcohol abuse as part of the disability determination. The ALJ thoroughly recounted Plaintiff's treatment history over the relevant period and adequately explained his finding that Plaintiff's impairments were not disabling, even when considered in combination with her drug and alcohol abuse disorder. *See* Tr. at 774–81. Because the ALJ explained that the totality of the evidence indicated Plaintiff exhibited only mild to moderate psychiatric symptoms and impairment to her level of functioning during all but brief periods of acute intoxication or noncompliance, it was unnecessary for him to assess whether Plaintiff's drug abuse and alcoholism were material to the disability determination. Pursuant to SSR 13-2p, the ALJ is not required to assess the materiality of an individual's drug abuse or alcoholism if he determines that the claimant is not disabled considering all impairments, including the drug abuse and alcoholism. Thus, having concluded that Plaintiff's impairments, including drug abuse and alcoholism, were not disabling, the ALJ was not required to determine whether drug abuse and alcoholism affected Plaintiff's mental impairments or whether her mental impairments would improve to the point of nondisability in the absence of drug abuse and

alcoholism. *See* SSR 13-2p. Furthermore, Plaintiff's assertion that she had no sustained period of sobriety throughout the nearly five-year relevant period further supports the ALJ's determination that Plaintiff's impairments were not disabling because it suggests that she was generally able to function with mild-to-moderate symptoms and functional limitations, despite ongoing substance abuse. In light of the foregoing, the undersigned recommends a finding that the ALJ's consideration of Plaintiff's drug abuse and alcoholism was consistent with the requirements of SSR 13-2p and supported by substantial evidence.

### 4.     RFC Assessment

Plaintiff argues the ALJ did not adequately assess her RFC. [ECF No. 14 at 38]. She maintains that the medical records do not support the RFC assessed by the ALJ. *Id.* She specifically contends that the ALJ did not consider her petite size or age in assessing her ability to perform medium work. *Id.* at 38–40.

The Commissioner argues Plaintiff bore the burden of proving she was disabled and failed to present evidence to suggest she was incapable of performing medium work. [ECF No 17 at 13–14]. She maintains that Plaintiff's age was not relevant to the RFC assessment. *Id.* at 14.

To adequately assess a claimant's RFC, the ALJ must determine the limitations imposed by her impairments and evaluate her work-related abilities on a function-by-function basis. SSR 96-8p. This often requires that the ALJ consider the claimant's ability to sustain work-related activities over an eight hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative

discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations, if available. *Id.* The Fourth Circuit has indicated that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to perform medium work that required she lift and carry up to 50 pounds occasionally and 25 pounds frequently, sit for six hours in an eight-hour day, and stand and/or walk for six hours in an eight-hour day. Tr. at 774. He found that Plaintiff must avoid concentrated use of moving machinery and moderate exposure to unprotected heights. *Id.* He determined Plaintiff was limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements that required only simple work-related decisions and involved few, if any, workplace

changes. *Id.* He further limited Plaintiff to a low-stress environment with only occasional public interaction. *Id.*

The ALJ explained the particular restrictions he assessed. He wrote that he considered Plaintiff's mental impairments and subjective reports of difficulty concentrating and anger-management problems in limiting her to unskilled work in a low-stress environment free of fast-pace production requirements, with few workplace changes, and only occasional interaction with the public. Tr. at 778. He indicated that he restricted Plaintiff to unskilled work in a low-stress environment with limited use of moving machinery and less than moderate exposure to unprotected heights because of her history of alcohol and substance abuse. Tr. at 779. The ALJ relied upon the state agency consultants' opinions to find Plaintiff could perform medium work. Tr. at 781. He imposed lifting and carrying limitations to account for Plaintiff's history of seizure disorder. *Id.* He later explained that he restricted the amount Plaintiff could lift and carry and her exposure to hazards and unprotected heights because of her history of seizure disorder and substance abuse. Tr. at 781. He indicated he limited Plaintiff to unskilled work with limited interactions with others in a low-stress environment with few, if any, workplace changes because of her mental disorders and history of alcohol and substance abuse. *Id.*

The undersigned recommends the court find that the ALJ adequately considered the record and cited substantial evidence to support the assessed RFC. The ALJ engaged in a thorough recitation of the medical evidence of record and explained the limitations he imposed and his reasons for imposing those limitations. *See* Tr. at 774–81. He

considered Plaintiff's statements in determining her RFC. *See* Tr. at 778. He also explained his reasons for rejecting additional restrictions indicated in the opinion evidence. *See* Tr. at 780 (according little weight to Ms. Logan's statements regarding the claimant's epilepsy and her assessment that Plaintiff had difficulty walking based on Plaintiff's relatively infrequent and sporadic treatment for seizure disorder and the absence of evidence of neurological or gait abnormalities during objective examinations), 781 (giving little weight to the state agency medical consultant who indicated Plaintiff could only frequently perform postural activities other than climbing and could perform limited reaching with her left upper extremity based on a lack of recent evidence of seizures and the absence of recent treatment notes that reflected objective abnormalities in Plaintiff's left upper extremity or cervical spine).

Although Plaintiff argues the ALJ erred in determining she had the RFC to perform work at the medium exertional level, Plaintiff points to no medical evidence or particular impairment that prevents her from performing medium work. Instead, she alleges the ALJ erred in failing to consider her height, weight, and age in assessing her RFC. Such consideration is specifically contraindicated by SSR 96-8p, which provides as follows:

> The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. **It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights).** Age and body habitus (i.e., natural body

> build, physique, constitution, size, and weight, insofar as they are unrelated
> to the individual's medically determinable impairment(s) and related
> symptoms) are not factors in assessing RFC in initial claims.

A footnote further explains that because the definition of disability in the Social Security
Act requires that the individual's inability to work be caused by a medically-determinable
impairment, the RFC must be concerned only with the impact of the disease process and
must not be influenced by the individual's age or body habitus. SSR 96-8p n. 5. Because
Plaintiff does not argue that her physical impairments prevented her from performing
medium work and because the ALJ considered Plaintiff's medically-determinable
impairments and the medical opinion evidence in finding Plaintiff had the RFC to
perform medium work, the undersigned recommends the court find no error.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the
Commissioner, but to determine whether her decision is supported as a matter of fact and
law. Based on the foregoing, the undersigned recommends the Commissioner's decision
be affirmed.

IT IS SO RECOMMENDED.

November 23, 2015                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).